**WELLINGTON GREEN HOME-OWNERS' ASSOCIATION and Kirkpatrick Management Company, Appellants–Defendants,**

v.

**Daniel J. PARSONS, Appellee–Plaintiff.**

No. 49A04–0108–CV–345.

Court of Appeals of Indiana.

May 29, 2002.

Jon C. Abernathy, Bradley J. Schulz, Goodin Kraege Abernathy & Miller, Nana Quay–Smith, Karl L. Mulvaney, Candace L. Sage, Bingham Summers Welsh & Spilman LLP, Indianapolis, IN, Attorneys for Appellants.

Russell T. Clarke, Jr., Emsweiller, Williams, Noland & Clarke, Indianapolis, IN, Attorney for Appellee.

## OPINION

RILEY, Judge.

### *STATEMENT OF THE CASE*

Appellants–Defendants, Wellington Green Homeowners' Association and Kirkpatrick Management Company (hereinafter collectively referred as "the Appellants"), appeal the denial of their motion for judgment on the evidence.

We reverse.

### *ISSUE*

The Appellants raise two (2) issues on appeal, one (1) of which we find dispositive and restate as follows: whether they can be held liable for injuries to an invitee when they had no notice of the hidden defect that caused the harm.

### *FACTS AND PROCEDURAL HISTORY*

On November 6, 1997, Appellee–Plaintiff, Daniel Parsons (Parsons), a mail carrier for the United States Postal Service, delivered mail to a condominium development known as Wellington Commons. Wellington Commons is owned by Wellington Green Homeowners' Association. Under a management agreement with Wellington Green Homeowners' Association, Kirkpatrick Management Company is the property manager for Wellington Commons.

Wellington Commons uses multi-box mailboxes for its mail receptacles. Parsons described a multi-box mailbox as follows:

> Well, it would be for a multi-family unit, more than—it would be an apartment building or condo where there's more than one (1) family residing in that building. And rather than having each individual mailbox by each door, there'd be one (1) central location, or a cluster where you deliver all the mail. . . .

(Tr. p. 28). Parsons used an "arrow key," which is a "master key that opens each individual—there's opening[s] for the five (5) units. We put the arrow key in the whole five-unit thing [and it] opens up where you can put mail in for five (5) residents." (Tr. p. 32). Parsons kept the arrow key on a chain, which was attached

to "a special thing that goes around [his] belt." (Tr. p. 35).

Parsons attempted to open a multi-box mailbox with his arrow key. However, it would not open. He turned the key back and forth and jiggled it. Parsons stated that there are "pins that connect, and sometimes it can be hung up. And if you can jiggle it, and those pins come free, and the box will open." (Tr. p. 34). As he jiggled the key, the multi-box mailbox came off the wall. It did not hit him, but it threw him off balance. Parsons testified:

I just—I twisted funny. It caused me to turn in a certain· way, because the majority of the weight was in [sic] my left and I was trying to set it [the mail] up there when the box went the other way. So I was just caught in an awkward position, and when the box fell, I assume it was just a—I twisted funny because of that. And I injured my self [sic].

(Tr. p. 36). Parsons felt immediate pain in his lower back and left leg.

Parsons testified that the multi-box mailbox was attached to the wall by screws in the drywall. The screws were not attached to the studs in the wall. Parsons saw that the screws had fallen into the mailbox at the time of the accident.

On October 1, 1998, Parsons filed a complaint for damages against the Appellants. In his complaint, Parsons maintained that as a direct and proximate result of the Appellants' negligence, he suffered serious and permanent injuries. On November 25, 1998, the Appellants filed their answer in response to Parsons' complaint. On June 19–20, 2001, a jury trial was held.

At the close of Parsons' case, the Appellants moved for a judgment on the evidence. The trial court denied the motion. At the close of all the evidence, the Appellants renewed their motion for judgment on the evidence. The trial court, again, denied the motion. On June 20, 2001, the jury rendered its verdict. The jury found that Parsons sustained $225,000.00 in damages, of which the Appellants were liable for eighty percent (80%), or $180,000.00. On July 27, 2001, the trial court entered its final judgment on the jury's verdict.

The Appellants now appeal. Additional facts will be supplied as necessary.

## DISCUSSION AND DECISION

The Appellants argue that the trial court erred in denying their motion for judgment on the evidence. Specifically, the Appellants argue that, even though Parsons was an invitee, they cannot be held liable, because they had no notice of the hidden defect that allegedly caused Parsons' injuries. We agree.

### Standard of Review

In *Roberson v. Hicks,* 694 N.E.2d 1161, 1163 (Ind.Ct.App.1998), *trans. denied,* this court held, in pertinent part, as follows:

On appeal, we apply the same standard of review as the trial court in determining the propriety of a judgment on the evidence, and look only to the evidence and reasonable inferences therefrom most favorable to the non-moving party. *Clark v. Wiegand,* 617 N.E.2d 916, 918 (Ind.1993). When the defendant moves for judgment on the evidence at the close of the plaintiff's case in a jury trial, the motion should be granted only where an issue in the case or an essential element of the claim is not supported by sufficient evidence. *See* Ind. Trial Rule 50(A); *Daub v. Daub,* 629 N.E.2d 873, 877 (Ind.Ct.App.1994). In other words, the court should withdraw the case from the jury only if there is a complete failure of proof on at least one essential element of the plaintiff's case. *Johnson v. Naugle,* 557 N.E.2d 1339, 1342 (Ind.Ct.App.1990). If there is any probative evidence or reasonable inference to be drawn therefrom or if there is

evidence which would allow reasonable people to differ as to the result, judgment on the evidence is improper. *Van Bree v. Harrison County,* 584 N.E.2d 1114, 1116 (Ind.Ct.App.1992).

### Duty

■ "The question of whether a duty to exercise care arises is governed by the relationship of the parties and is an issue of law within the province of the court." *Douglass v. Irvin,* 549 N.E.2d 368, 369 (Ind.1990). It is undisputed that Parsons was an invitee on the Appellants' property. In *Burrell v. Meads,* 569 N.E.2d 637, 639–40 (Ind.1991), *reh'g denied,* our supreme court held, in pertinent part, as follows:

[A] landowner owes the highest duty to an invitee: a duty to exercise reasonable care for his protection while he is on the landowner's premises. *Hammond v. Allegretti* (1974), 262 Ind. 82, 311 N.E.2d 821. The best definition of this duty comes from the Restatement (Second) of Torts § 343 (1965):

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

This Court has used the definition in § 343 in resolving premises liability cases. *Hammond,* 262 Ind. at 85, 311 N.E.2d at 824; *Douglass v. Irvin* (1990), Ind., 549 N.E.2d 368, 370.

■ As previously stated, at the close of Parsons' case, the Appellants moved for a judgment on the evidence. In support of their motion, the Appellants argued, in pertinent part, as follows:

First of all, the allegations have been in this case from the Complaint, from the Plaintiff's Answers to Interrogatories, from the Plaintiff's own testimony that my clients negligently installed or placed these boxes on the wall at Wellington Commons. And there has been absolutely no evidence that my clients did that installation, put those boxes on the wall prior to this incident. In fact, the only evidence has been that nobody noticed who put them up, nobody knows when they put them up. We've stipulated that the building was constructed in 1987 or 1988, and it's assumed by everyone, I suppose, that the boxes were installed at that time. But there certainly is no evidence that it was my clients that did that installation or did it in a negligent fashion. That is fatal to the Plaintiff's case, we believe, in failing to prove what they have alleged in their Complaint.

Secondly, this is a premises liability case, of course, and in a case such as this, in addition to a duty and a breach of duty Plaintiff must show that there is a hidden defect that my client was on notice of, and yet failed to warn the Plaintiff of it, or take corrective action. And in this particular case, Your Honor, there has been absolutely no evidence submitted by the Plaintiff that my clients were on notice of a defect with the mailboxes. In fact, Mr. Bailey who has just testified indicated that he was unaware of any prior problems with the mailboxes. Further, to bolster this, I think, really from the Plaintiff's own testimony is that the mail carriers who delivered mail, as Mr. Kelly suggested, perhaps as many as 3,130 times in the past ten (10) years never encountered a problem with these mail boxes before.

In fact, their procedure was if they had a problem, they were to call their supervisor; and Plaintiff indicated in his testimony that that never occurred to his knowledge, nor did it to the knowledge of the co-worker or supervisor that testified yesterday, Monique Mosley. And if anyone is in a position to know if there is a problem, it certainly is the individuals who are actually coming out and opening these with the key six (6) days a week. And, Your Honor, there just is [a] total absence of any evidence showing that my clients were on notice of a problem, or that they negligently failed to take action to detect a problem. Plaintiff has shown no evidence of that either.

(Tr. pp. 182–83).

Jeff Bailey (Bailey), a maintenance technician for Kirkpatrick Management Company, testified at trial. Bailey testified that he had been employed by Kirkpatrick Management Company for approximately nine (9) months prior to November 6, 1997. As a maintenance technician, Bailey stated that he occasionally does "preventive maintenance." (Tr. p. 168). When asked if he ever checked to see if the multi-box mailboxes were securely attached to the wall at Wellington Commons, Bailey said, "No." (Tr. p. 169).

On cross examination, the following exchange took place between Bailey and the Appellants' counsel:

Q You had never had any problems, yourself, with these boxes before, had you?

A No.

Q You had never noticed that these boxes were not securely mounted to the wall, did you?

A No.

Q You were never notified by anyone else that there were any problems with these boxes, were you?

A No.

Q I'd like to talk to you a little bit about preventive maintenance. You could have checked those boxes, couldn't you?

A Not the screws, but I could have jiggled them I suppose.

Q Well, we'll talk about that a little bit later. You could have jiggled them?

A Correct.

Q The fact of the matter is you didn't, right?

A I did not.

Q And that's because you had no reason to believe that there was anything wrong with them, right?

A No.

Q You never had any notice that there were any problems with these mailboxes, did you?

A No, I did not.

Q And as far as you knew, no one else at Kirkpatrick had that problem, or was otherwise notified of that, did they?

A No.

Q It's like the old saying, "If it ain't broke, don't fix it?"

A Right.

Q You said—I'm talking about the screws. Am I to understand you correctly that there was no way that you could see those screws?

A Not with the box closed, no.

Q You could with the box opened?

A Yeah. Open and the front lifted out of it.

Q Why didn't you just do that?

A You need a postal key to open it.

Q Do you have a postal key as a member of Kirkpatrick?

A No.

Q Does Kirkpatrick have a postal key?

A No.

Q Does the homeowners['] association, do they have a postal key?

A No.

Q In fact, the only people with a postal key is the United States Postal Service?

A Correct.

Q So you couldn't do that even if your [sic] wanted to, could you?

A No.

(Tr. pp. 174–76).

In *Howerton v. Red Ribbon, Inc.*, 715 N.E.2d 963, 965 (Ind.Ct.App.1999), *trans. denied*, Stanley Howerton (Stanley), a motel guest, took a bath. As he raised himself up to exit the bathtub, he grasped the grab bar on the side wall of the bathtub-shower unit. *Id.* Stanley pulled himself about half-way up using the bar. *Id.* The bar supported his weight, and it did not move. *Id.* However, as he continued to pull on the bar to further raise himself, the bar came out and Stanley fell, injuring his knee. *Id.*

Subsequently, the plaintiffs, Stanley and Helen Howerton (the Howertons), filed a complaint against Red Ribbon, Inc., Super 8 Motels, Inc., and Sterling Plumbing Group f/k/a Sterling Faucet Co. *Id.* Red Ribbon owned and operated the motel. It also owned the real estate where the motel was located. *Id.* Red Ribbon and Super 8 had a franchisee/franchisor relationship, with Super 8 being the franchisor. *Id.* Super 8 had no direct control over the operation of the motel. *Id.*

At trial, the Howertons presented evidence over the course of two (2) days. *Id.* According to the products manager for the plumbing supply company that sold the bathtub-shower unit, the units had cotter pins at each end of the grab bar. *Id.* The bar fit through holes in molded fiberglass shelves in the back wall of the bathtub-shower unit. *Id.*

At the close of the Howertons' case regarding liability, all defendants moved for a judgment on the evidence. *Id.* The trial court granted the motions. *Id.* On appeal, this court affirmed the trial court's grant of Red Ribbon's motion for judgment on the evidence and stated, in pertinent part, as follows:

The unit was installed in the wall, and Red Ribbon had no means of inspecting the back of the unit. No evidence was adduced of any reports of a problem with any unit at Red Ribbon. Howerton himself indicated that the bar supported his weight and did not move as he initially pulled himself up. No substantial evidence or reasonable inference could be drawn from the Howertons' evidence to support their rhetorical claims that proper inspection would have "discovered the defect." Howertons' Brief at 16. *See First Bank of Whiting [v. Schuyler,* 692 N.E.2d 1370, 1372 (Ind.Ct.App. 1998), *trans. denied* ]. Therefore, judgment on the evidence in favor of Red Ribbon was not erroneous.

*Id.* at 968.

*Howerton* is similar to the present case. Here, the Appellants were hindered in their ability to inspect the multi-box mailboxes. Granted, Bailey stated that he could have jiggled the multi-box mailboxes to see if they were securely attached to the wall. However, there was never a reason to do so, as there was no evidence of any complaints made by the tenants of Wellington Commons, or by another mail carrier, regarding the multi-box mailboxes. Moreover, there was no evidence that the Appellants installed the multi-box mailboxes. Thus, there was no evidence that the Appellants were aware of how the multi-box mailboxes were attached to the wall, i.e. whether the screws were attached to the studs, or to the drywall.

With regard to the condition of property, a landowner's duty of care to an invitee is a known or should have known standard. *See Burrell*, 569 N.E.2d at 640. In the present case, there was no evidence that the Appellants knew or should have known about the defect that allegedly caused Parsons' injuries. Further, there was no evidence that, even if Bailey had jiggled the multi-box mailbox, he would have discovered the defect. *See Howerton*, 715 N.E.2d at 968.

Accordingly, we find that there was a complete failure of proof on at least one (1) essential element of Parsons' case. *See Roberson*, 694 N.E.2d at 1163. There was no evidence to support the fact that the Appellants knew, or by the exercise of reasonable care would have discovered, the condition that allegedly caused Parsons' injuries. *See Burrell*, 569 N.E.2d at 640. Therefore, the Appellants could not have been aware of any unreasonable risk of harm to Parsons. *See id.*

### CONCLUSION

Based on the foregoing, we conclude that the trial court erred in denying the Appellants' motion for judgment on the evidence.

Reversed.

MATTINGLY–MAY, J., and VAIDIK, J., concur.